UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
SHREVEPORT DIVISION

ROBERT GLEN COLEMAN #494656          CIVIL ACTION NO. 20-cv-341

VERSUS                               JUDGE S. MAURICE HICKS, JR.

DARREL VANNOY                        MAGISTRATE JUDGE HORNSBY

**REPORT AND RECOMMENDATION**

**Introduction**

On New Year's Day 2003, criminals entered the home of Julian and Alice Brandon. Julian, a retired Baptist preacher, was shot under the chin with a .380 pistol, then stabbed and cut several times. He died from the wounds. The perpetrators placed a pillow over Mrs. Brandon's face and shot her in the head. She was still alive, though permanently disabled, when the couple was found four days later.

A Caddo Parish jury indicted Robert Glen Coleman ("Petitioner") for the first-degree murder of Mr. Brandon and attempted first-degree murder of Mrs. Brandon. An amended indictment severed the non-capital offense, and the case went to trial on one count of first-degree murder of Mr. Brandon. In 2005, a jury found Petitioner guilty and voted to impose the death penalty. The conviction and sentence were overturned due to a Batson violation. State v. Coleman, 970 So.2d 511 (La. 2007). In 2012, a jury again convicted Petitioner and voted to impose the death penalty. The conviction was affirmed, but the death sentence was overturned due to lack of notice of evidence of an unadjudicated murder

that was introduced in the penalty phase.  State v. Coleman, 188 So.3d 174 (La. 2016).  On remand, the State agreed to the imposition of a life sentence.

Petitioner pursued a post-conviction application in state court.  He now seeks federal habeas corpus relief based on claims that the state court denied on the merits, either on direct appeal or post-conviction.  The habeas claims are Brady violations, erroneous exclusion of evidence, ineffective assistance of counsel, denial of the right to testify, and the effect of cumulative errors.  For the reasons that follow, it is recommended that the petition be denied.

**Relevant Facts**

Petitioner does not challenge the sufficiency of the evidence to support his conviction.  The facts presented in his habeas memorandum were copied from the Louisiana Supreme Court's decision that affirmed his second conviction, which is at issue here.  The court will, accordingly, summarize those findings, with some supplemental material from the record, with an eye toward providing background relevant to the Brady, Strickland, and other habeas claims.

In August 2002, Brandy Holmes stayed for a time with her father and his wife in Tylertown, Mississippi.  Brandy soon moved in with her new boyfriend, Petitioner.  Brandy's father owned a .380 pistol, but he noticed it was missing after Brandy and Petitioner visited just before Christmas 2002.

On Christmas Eve 2022, Petitioner and Brandy traveled to Shreveport, Louisiana to visit Brandy's mother, Brenda Bruce.  They held a New Year's Eve party, at which a witness saw Petitioner with a pocket-size handgun.  Petitioner later asked the witness if he

knew where Petitioner could "hit a lick," which the man understood to mean that Petitioner wanted to rob someone.

The next day, January 1, 2003, Julian and Alice Brandon were attacked in their home on Primitive Baptist Church Road in the Blanchard community. Crime scene investigators determined that the perpetrators shoved through the front door and shot Mr. Brandon through the chin, from close range. A portion of the bullet lodged in his brain, and a portion exited and embedded in the ceiling above him. He was then repeatedly stabbed and cut with multiple kitchen knives from the home. The criminals took Mrs. Brandon to a bedroom, where they placed a pillow over her face and shot her in the head.

Four days later, a concerned friend went to check on the Brandons. He looked through a glass back door and saw Mr. Brandon's body in a pool of blood. He went to a neighbor's house and called the police. The responding officers found that Mr. Brandon had been dead for some time. Mrs. Brandon was alive but incapacitated. The first officer to arrive said that it seemed Mrs. Brandon wanted to say something, but she could not speak, and her eyes could only track from side to side.

Tommy Adams, a paramedic, testified that Mrs. Brandon told him that two white persons attacked her and her husband. (Brandy Holmes is white; Petitioner is black.) After admission to the hospital, a tracheotomy was implanted in Mrs. Brandon, and she never spoke again. She could only nod or shake her head in response to questions, and even that yielded inconsistent information about her attackers. After Mrs. Brandon was discharged from the hospital, daughter Dawn Finley, a nurse, provided constant care until Mrs. Brandon passed away in 2008.

The first officer on the scene noted a jewelry box in disarray and a piece of jewelry on the kitchen floor.  It was determined that Mr. Brandon's wallet, debit and credit cards, and at least four pieces of Mrs. Brandon's jewelry were missing.

No fingerprints taken at the scene matched any person of interest.  Several DNA samples were collected.  On a door leading to the garage, Detectives found an area of dried blood that contained a small diamond pattern.

Investigators learned that, shortly after New Year's Day, Brandy Holmes was at the nearby Blanchard Place Apartments trying to sell jewelry and talked about killing an old couple down the road by a church.  Detectives went to the Holmes family trailer, which was on Roy Road, just around the corner from the murder scene.  Holmes, Petitioner, and other family members agreed to go to the sheriff's detective office on North Market Street for interviews.

When detectives first saw Petitioner in a rear bedroom of the trailer, he was not wearing shoes.  When asked to come to the station, he put on a pair of black boots that were next to him on the floor.  At the station, Petitioner said that he had no knowledge of the murder, and he and Brandy had come to Shreveport just before Christmas and been inseparable since their arrival.  He repeated to another officer that he did not believe Brandy was involved because the two had been at each other's sides since arriving in Shreveport.  Captain Bobby Abraham noted a fresh injury on Petitioner's right hand, which Petitioner said happened while he was working on a bicycle.

Lt. Owen McDonnell saw what appeared to be blood on Petitioner's boots.  When he asked about the blood, Petitioner claimed that the boots were not his but actually

belonged to Brandy's brother. The officers recognized that the soles of the boots were similar to prints at the crime scene, so they collected them along with the other interviewees' shoes. Petitioner said the boots were his only shoes, and that he "wouldn't be stupid enough to walk into a police station with blood on [them]." Officers loaned him a pair of inmate rubber boots to keep him from being barefoot. McDonnell found that the boots taken from Petitioner shared the same tread detail, size, and shape as a print lifted at the crime scene. Testing of the blood stains on the boots revealed the presence of Mr. Brandon's DNA.

Brandy was interviewed separately. When the interviewing deputy stepped away, and Brandy was allowed to use the restroom unaccompanied, she took the opportunity to remove three cassette tapes from the interview room and pull out all the tape. She also flushed down the toilet the jewelry she had been wearing. Captain Abraham testified that he had two detectives investigate Sean George and Johnny Wright (based on statements made by Brandy). After a thorough investigation, neither of those men was deemed to be a suspect.

A detective drove Petitioner back to the Ms. Bruce's trailer. As Petitioner got out, he returned the rubber boots and entered the trailer with only socks on his feet. The officer went drove two or three hundred yards on his way back to the station before receiving a call to reclaim Petitioner. When the detective got back to the trailer less than two minutes later, Petitioner met him at the open door. Petitioner was shoeless and holding a duffel bag. He agreed to go back for more questioning, but he said he needed to get to the bus station afterward. A consensual search of the duffel bag led to a pair of jeans, on which

officers found blood evidence connected to the homicide of Terrance Blaze, a separate incident.

Petitioner was arrested for the murder of Mr. Brandon.  He was taken to the Caddo Correctional Center, where he was temporarily in an intake cell with inmates Collies Sharpes and Bobby Evans.  The men did not know each other before being placed together in the cell.  Petitioner made statements to them indicating his involvement in the crime. After Petitioner was removed from the cell, one of the men called a guard and told him what Petitioner said.  The next day, both men gave recorded statements to a detective.

Sharpes testified that Petitioner said he had been arrested for murdering an "old couple up in Blanchard."  According to Sharpes, Petitioner said that he instructed his girlfriend Brandy to "knock off" the couple to see whether she had what it took to kill, and he had taken a bracelet from the victims.  Sharpes testified that Petitioner said Brandy did the killing and attempted to cover her tracks by flushing some of the victim's jewelry down the toilet at the police station.  Petitioner boasted that the police "didn't have anything on him," and told the men he was from Mississippi.  Sharpes testified that he had not received anything for his testimony, and he had not received any information about the crime from law enforcement or through news reports.

Bobby Evans also testified about the jailhouse encounter.  At the second trial, he became uncooperative.  He acknowledged his testimony at the first trial, but he said he no longer wanted anything to do with the case because he had time left to serve and wanted to focus on his own case.  He eventually confirmed that Petitioner said that he and his girlfriend Brandy killed "two old people" and that he was putting Brandy to a test.  Evans

said that Petitioner told him that he had blood on his shoes, he buried the murder weapon behind the victims' home, Brandy's brother was present during the murder and wore Petitioner's shoes while Petitioner wore someone else's shoes to "throw people off," and Brandy flushed the victim's bracelet down the toilet. Evans said that Petitioner told him that Brandy shot the woman, and Petitioner shot the man. Evans denied that detectives or news reports had given him any of the information about the crime. On cross-examination, Evans conceded that he told the grand jury, contrary to his trial testimony, that Petitioner said Brandy shot the man and Petitioner shot the woman.

Attorney Pam Smart testified that she was appointed to represent Sharpes and Evans on their separate charges that led to them being in a cell with Petitioner. Each man was charged with felony theft. Their cases were resolved by routine plea bargains. Smart did not approach the Caddo DA, and that office did not approach her, about any plea bargain that would call for the testimony of Sharpes or Evans in the Brandon murder case.

On the evening of the murder, January 1, 2003, surveillance cameras captured two persons attempting to use an ATM at the Northwood Branch of Hibernia National Bank. The ATM did not record which card was inserted, but data showed that the users inserted a card and entered an incorrect PIN. Brandy's father viewed a surveillance image and identified Brandy (a white female) as the female and testified that the black male with her looked like Petitioner. Brandy's stepmother identified Brandy and Petitioner in the same photograph. That same evening, the bank's computers recorded two separate failed attempts to withdraw $200 using Mr. Brandon's bank card at an ATM in a convenience store near the Brandon home. The attempts were declined due to an incorrect PIN. There

was no surveillance camera at that ATM.  Testimony showed that it was an easy walk to either of the ATM locations from the Bruce trailer or the Brandon home.

A search warrant was executed at the Bruce trailer.  Officers found two pillows with apparent bullet holes, similar to the one found near Mrs. Brandon.  They also found a box of plastic food prep gloves from a Subway restaurant.  The gloves had a small diamond pattern consistent with the pattern in the dried bloodstain found on the Brandons' door.  Near the trailer, there was a bottle of bleach and a burned pile of charred clothing and other items.  The gutter along the roof was found to hold three spent shell casings and a clear plastic glove that contained a pearl bracelet and a gold bracelet with multi-colored stones.  The Brandons' daughter identified the multi-colored bracelet as one she had given her mother and that was missing from the home after the attack.  One of the shell casings tested positive for Mr. Brandon's DNA.

Investigators traveled to Mississippi and recovered spent shell casings and bullets from an area where Brandy's father had used his .380 handgun for target practice.  A crime lab expert concluded that a bullet taken from a Mississippi pine tree in Mr. Holmes' backyard was fired by the same weapon that shot Mr. Brandon.  That same weapon also fired at least one of the bullets that yielded the shell casings recovered from the gutter of the Bruce trailer.  The shell casings collected from Mississippi were from the same gun that produced the casings found in the gutter.

Petitioner's brother, Bradley Brumfield, was about 10 years younger.  He testified that the two lived together from 1998 to 2000.  Bradley said that he wore a size 10.5 or 11 shoe, and he and Petitioner would share clothes and shoes.  He believed Petitioner wore

the same size shoe.  He said that he had never seen Petitioner wearing the size nine boots that were taken from him at the police station.

At the first trial. the defense presented Tommy Adams, a paramedic with Life Air Rescue.  Adams died before the second trial, but his prior testimony was presented to the jury.  Adams testified that fire department personnel treated Mrs. Brandon—starting her on oxygen and a saline IV—before he arrived.  Adams was with the patient for about 22 minutes before liftoff.  He found her to be alert and able to respond to simple questions. The fire department medics had assessed her with an altered mental status and a score of 10 on the Glasgow Coma Scale, but Adams said she had improved to a 14 (15 is the maximum score) by the time of his assessment.  Ms. Brandon followed commands to squeeze his finger, wiggle her toes, and touch her face.  She was able to engage in what Adams considered normal conversation.  She told Adams that she was not allergic to any medications, and that she did not take any medications.  Adams wrote in his report that the patient said she was "hit in the head" and, "States she and her husband were attacked by two white males."  He said he radioed the information about the attackers "as we were lifting off" and later wrote an addendum that he faxed to a deputy.

Although Adams' testimony suggested his conversation with Mrs. Brandon took place in her home pre-flight, his written addendum described stabilizing her and loading her in the helicopter before he turned to the description of the attackers. It thus implied that the conversation took place aboard the helicopter.  He wrote: "I asked her if she knew what happened to her.  She stated yes.  I asked was she assaulted, she said yes.  I asked her did someone enter their home she said yes.  I asked her if they were white, black or Hispanic.

She said white.  I asked her if there was more than one.  She said yes, two."  Adams testified that Mrs. Brandon did not say anything else after he radioed that information.  Tr. Vol. 22, pp. 4602-4637.

The defense also called Mike Brandao, who worked as a flight nurse with Tommy Adams.  He recalled that, while in the Brandon home, Adams was at the head of the patient "conversing with her."  Brandao was at her feet.  He said Mrs. Brandon was "responding and speaking," but he could not hear or understand what she said to Adams in the busy and noisy room.  The patient was alert enough to respond to Brandao's commands by squeezing his hand or moving her foot.  On cross-examination, he said that the helicopter is loud, and the crew wear helmets.  They are able to communicate aboard only via the intercom.  He and Adams sat together at the head of the patient in the tight quarters.  Mrs. Brandon was wearing an oxygen mask, and he did not observe her communicating anything after they boarded the flight.  Tr. Vol. 49, pp. 10989-11004.

During the penalty phase, evidence was introduced that Holmes and Petitioner were also involved in the murder of Terrance Blaze.  During interrogation, Brandy told a detective that she participated in the murder of Blaze just a day or so before.  Blaze's body was found on a country road, covered with pine limbs and pine straw.  He had been shot in the head.  A .380 casing found at the Blaze crime scene was tied to the same weapon that fired the casings recovered from the gutter.  The bullet was too damaged for a match.  A plastic glove with the same diamond pattern was also recovered from the Blaze scene.  Blaze's blood was found in Brandy's mother's car, despite an attempt to clean the car with bleach, as well as on Petitioner's boot and pants leg.

**Brady Claims**

Petitioner characterizes the State's theory as being that Petitioner was testing Brandy and that Petitioner had to be part of the murder because he and Brandy were inseparable during their time in Shreveport.  In a post-conviction application, he argued that the State failed to disclose evidence that could have helped the defense challenge that theory.  The items of evidence are:

1. A 2/2/2004 fax from Julie Lloyd, a daughter of the Brandons, to DA investigator Don Ashley, stating: "My mother remembers what happened on Jan. 1 2004.  We need to meet and discuss this new information."

2. An interview with witness Perry Hughes in which he stated that Brandy Holmes cased his home, which was located directly across the street from the Brandons' house, before she met Petitioner.

3. Information that Brandy Holmes was charged as a juvenile with accessory to first-degree murder and first-degree murder and had previously been involved in gang-related violence.

4. A District Attorney's Investigator's recorded interview with Samuel Lashay Simpson, in which he said that Brandy Holmes left 3737 Roy Road (the Bruce trailer) on several occasions without  Mr. Coleman.

Brady holds that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."  Brady v. Maryland, 83 S.Ct. 1194, 1196-97 (1963).  To establish a Brady claim a petitioner must establish that the evidence was (1) suppressed, (2) favorable, and (3) material.  Wright v. Quarterman, 470 F.3d 581, 591 (5th Cir. 2006).  Evidence is material if it "could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 115 S.Ct. 1555, 1566 (1995).

The state court denied the Brady post-conviction claims on the merits.  Judge Katherine Dorroh ruled:

> As this case has been litigated twice, the dates as to when the allegedly withheld information became known are necessary.  After a careful review of the record, Petitioner has failed to prove that the information was not known by Petitioner or his attorney at the time of either trial.  Petitioner has not provided an affidavit from the investigating officer.  The State, in its objection to the instant application, responds to this claim with an affidavit from Brady O'Callaghan, which shows that there was an "open file policy on any defendant's discovery request."  As such, there does not appear to be any evidentiary withholding from the State.  Therefore, the requirements set forth in Brady v. Maryland, 373 U.S. 83 (1963) (sic).  Therefore, Petitioner's Brady claim has no merit.

Tr. Vol. 55, pp. 12502-03.  The state appellate court denied a writ application, ruling: "On the showing made, the writ is denied."  Tr. Vol. 56, p. 12766.  The Supreme Court of Louisiana denied relief in a per curiam decision (Tr. Vol. 57, pp. 13043-13044) that stated:

> Denied … Applicant also fails to show that the State withheld material exculpatory evidence in violation of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). In addition, a portion of the application is repetitive.  La. C. Cr. P. art 930.4.

Habeas corpus relief is available with respect to a Brady claim that was adjudicated on the merits in the state court only if the adjudication resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States.  28 U.S.C. § 2254(d)(1).  Dickson v. Quarterman, 462 F.3d 470, 477 (5th Cir. 2006).  It is not enough that the state court decision applied the law erroneously or incorrectly; rather, the application of the law must be "objectively unreasonable."  Mahler v. Kaylo, 537 F.3d 494, 499 (5th Cir. 2008).

The state trial court's denial of the <u>Brady</u> claim rested on its factual finding that the prosecution had an open-file policy that provided the defense access to any discovery material.  The court referred to an affidavit from the prosecutor.  The State's discovery responses also included representations that: "All items of evidence may be examined by defense counsel upon appointment with the undersigned Assistant District Attorney."  Tr. 6379, 6452 & 7023.

Petitioner challenges that finding, pointing to some information that he represents was not learned until later, but "a determination of a factual issue made by a State court shall be presumed to be correct," and the petitioner has the burden of rebutting that presumption by "clear and convincing evidence."  § 2254(e)(1).  Petitioner did not provide the state court with competing evidence.

Petitioner argues that the state court should have held a hearing to develop the evidence.  But "a full and fair hearing is not a precondition to according § 2254(e)(1)'s presumption of correctness to state habeas court findings of fact nor to applying § 2254(d)'s standards of review."  <u>Boyer v. Vannoy</u>, 863 F.3d 428, 446 (5th Cir. 2017), quoting <u>Valdez v. Cockrell</u>, 274 F.3d 941, 951 (5th Cir. 2001).  The record does not allow the overturning of the factual determination made by the state court on this point.

The Supreme Court of Louisiana's decision stated that Petitioner failed to show that the State withheld material exculpatory evidence.  Thus, the court at least implied that the evidence at issue was not material under <u>Brady</u>.  That finding was not an objectively unreasonable application of <u>Brady</u>, so habeas relief is also unwarranted for that reason.  To support that determination, the materiality of each item is addressed below.  It must be kept

in mind that <u>Brady</u>'s materiality standard is a general rule, meaning a wide range of reasonable applications exist. <u>Cobb v. Thaler</u>, 682 F.3d 364, 381 (5th Cir. 2012), citing <u>Yarborough v. Alvarado</u>, 124 S.Ct. 2140 (2004) ("The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations.")

The State responded to the post-conviction claim about the fax from Mrs. Brandon's daughter by filing with the state court an affidavit from investigator Don Ashley. He testified that he received the fax that stated Mrs. Brandon remembered what happened, so he arranged to meet with Mrs. Brandon and discuss the matter with her daughter. Ashley testified:

> I found Mrs. Brandon's condition had not changed from my initial contact with her in early 2003. She could not recall the events of January 1, 2003. Mrs. Brandon provided no new or additional information regarding the events of January 1, 2003. I found Mrs. Brandon lacked the ability to confirm any information concerning the crime of January 1, 2003, as she was inconsistent with her responses to the simplest questions. I found Mrs. Brandon lacked the capacity to be questioned about the crime of January 1, 2003.
>
> My assessment of Julie Lloyd's comment on the fax was she was hoping beyond hope that her mother may have improved when in fact Mrs. Brandon exhibited nothing to suggest she had to me.

Tr. Vol. 55, p. 12480. The State also points to a statement by one of the defense counsel that, with respect to a video of Mrs. Brandon prepared for use in the penalty phase, it was "obvious from viewing this video that she will be unable to deliver competent testimony." Tr. Vol. 11, p. 2509. These facts undermine any contention that the fax was material. The defense not having it, in light of the Ashley testimony, does not undermine confidence in the verdict.

With respect to the interview with Samuel Simpson, Petitioner contends that it is important to undermine the prosecution's theory that Holmes and Petitioner were always together. That suggestion came from Petitioner's own statement to police. The prosecution did mention his remarks, but the bulk of its case was based on the DNA evidence and witness testimony about Petitioner's motivation to rob someone, his presence in the area of the crime scene, his use of the victim's bank cards soon after the murder, access to the murder weapon, and the like. The suggestion that the two were inseparable was not a critical component of the prosecution's case.

Petitioner points to the interview of Perry Hughes (Brandy cased his house before she met Petitioner) and contends it supports the defense theory that Brandy acted without Petitioner. There was, however, ample other evidence that the State provided Petitioner that suggested Brandy Holmes' criminal nature, including police reports detailing how she had tried to persuade people to let her enter a nearby gated subdivision and how she had attempted to talk her way inside a woman's home. There was also her criminal history, discussed below. Additional evidence that Brandy was thought to be casing a nearby home would have been merely cumulative.

Finally, Petitioner faults the State for not providing Brandy's juvenile history of involvement in a first-degree murder. The State responds by pointing to a transcript of an interview with Brandy's father that was tendered in discovery. Mr. Holmes discussed how Brandy was jailed for about ten years as a juvenile because of something to do with a gang killing. He also described her attacks on prison guards. Tr. Vol. 4, pp. 941-45. The State also points to a question by defense counsel at a pretrial hearing where he asked a detective

if she was aware of a murder that Brandy had been involved in as a juvenile. Tr. Vol. 37, pp. 2254-55. That suggests that the defense was aware of Brandy's history in this regard. Finally, the trial judge turned over all juvenile records of Brandy Holmes during the course of the trial. Tr. Vol. 44, pp. 10075-76. The judge made no mention of a homicide charge as being among those records. It appears that the available records were turned over, and indications of Brandy's involvement in a homicide were made known to the defense either through the records or by other means. Records later obtained, according to Petitioner, established that Brandy Holmes was sentenced to juvenile life for accessory to first-degree murder and that the offense was gang-related. The details may have been learned later, but the essence of the information was provided to the defense before or during trial.

In assessing materiality, the court must evaluate the evidence cumulatively rather than looking at each piece of evidence in isolation. Wearry v. Cain, 136 S.Ct. 1002, 1007 (2016). Even when the items at issue are considered together, there is no basis for finding that the state court's application of Brady was so off-base as to warrant setting aside the murder conviction under the demanding standard of Section 2254(d). Habeas relief is not warranted on any of the Brady claims, individually or cumulatively.

**Right to Present a Defense**

### A. Introduction

Petitioner argued in the trial court and on appeal that he should have been able to introduce statements made by Brandy Holmes, some of which exculpated Petitioner and inculpated alternate suspect Johnny Wright. The state courts found that the evidence was not admissible under state evidence law and that it did not violate the constitutional right

to present a defense.  Petitioner now seeks habeas corpus relief on the grounds that the exclusion of the evidence violated his right to present a defense.  He contends that the state court's ruling was an unreasonable determination of the facts and an unreasonable application of clearly established law as decided by the Supreme Court.  That law is said to be found in <u>Chambers v. Mississippi</u>, 93 S.Ct. 1038 (1973) and <u>Holmes v. South Carolina</u>, 126 S.Ct. 1727 (2006).

### B. **<u>Chambers</u>** and **<u>Holmes</u>**

In <u>Chambers</u>, a murder defendant called a witness named McDonald, who had previously confessed to the murder.  McDonald repudiated the confession on the stand, and the defendant was denied permission to examine McDonald as an adverse witness based on the state's voucher rule that barred parties from impeaching their own witnesses.  The defendant attempted to introduce testimony from three other persons who heard McDonald make self-incriminating statements, but the state hearsay rule did not include an exception for statements against penal interest.  The Supreme Court held that the exclusion of McDonald's out-of-court statements, coupled with the voucher rule's denying the defense the ability to cross-examine McDonald, denied the defendant a trial in accord with traditional and fundamental standards of due process.

In <u>Holmes</u>, the defendant sought to introduce proof that another man, White, had attacked the victim.  He proffered four witnesses who would testify that White had either acknowledged that the defendant was innocent or had actually admitted to committing the crimes.  The trial court excluded this third-party guilt evidence, and the state supreme court upheld the decision based on a rule that where there is strong evidence of guilt, especially

strong forensic evidence, proffered evidence about a third party's alleged guilt does not raise a reasonable inference as to the defendant's own innocence.  Citing <u>Chambers</u> and other decisions regarding the right to present a defense, the Supreme Court vacated the judgment.  It reasoned that, as applied, the state evidence rule called for little, if any, examination of the credibility of the witnesses or the reliability of the evidence.  As such, the rule did not rationally serve the ends of rules designed to promote a focus on the central issues by excluding evidence with only weak logical connection to those issues.

### C. State Court Decision

Prior to trial, Petitioner filed a motion to admit various statements made by Brandy Holmes.  His memorandum characterized the statements as follows:

1. A pre-arrest statement to acquaintances Chris Addison, Marvin Brown, and Johnny Wright, that she killed some old people.

2. A custodial statement denying personal involvement and claiming Wright committed the murders.

3. A custodial statement that she shot Mr. and Mrs. Brandon and stabbed Mr. Brandon while defendant and Wright were both present.

4. A custodial statement that she shot both Brandons, that Wright cut Mr. Brandon, and that defendant did not participate.

5. A custodial statement that she and Wright committed the crimes while defendant was at her mother's trailer.

6. A custodial statement that Sean was not involved, that she and Wright planned the attack, and defendant "tagged along" but left saying he wanted nothing to do with it.

7. A custodial statement that she did not murder anyone.

8. A custodial statement that someone other than defendant was present with her during the crimes.

9.    A letter to her mother stating that Wright committed the crime while defendant was at the trailer.

10.    A letter to her friend Shay stating that Wright should take the charge.

11.    A letter to defendant in which she stated that defendant was innocent.

Judge Michael Pitman denied the motion to admit the several statements.  He noted that Brandy Holmes had been convicted and sentenced to death (later reduced to life without parole), and she would be unavailable to testify if called as a witness in this case because she would assert her Fifth Amendment privilege against self-incrimination.  He next turned to L.C.E. Art. 804(b)(3), which includes a hearsay exception if the declarant is unavailable and a statement tended to subject the declarant to criminal liability.  The rule stated: "A statement tending to expose the declarant to criminal liability and offered to exculpate the accused is not admissible unless corroborating circumstances clearly indicate the trustworthiness of the statement."

Judge Pitman said that the varying statements made by Holmes asserted myriad possibilities, including that she acted alone, that Johnny Wright was the sole perpetrator, that she and Johnny perpetrated the murder together, that she was innocent, that Petitioner was present but did not participate in the murder, and that Petitioner was not present at all.  Holmes had made another statement to police that implicated Petitioner; she destroyed the tape on which that statement was recorded.  The trial judge found that the "statements are extremely inconsistent, and the defense does not offer enough evidence that Ms. Holmes was not falsifying her statements to protect Robert Coleman, with whom she had a sexually intimate relationship at the time of the events in question."  The judge looked to the rule,

as well as Chambers v. Mississippi, and found that the proposed statements had not been shown sufficiently trustworthy for admission. The statements were inconsistent and, without the benefit of cross-examination of Holmes as to the reasons for the inconsistencies, a jury could not properly assess the credibility of the statements. Tr. Vol. 31, pp. 6618-20.

The Louisiana Supreme Court reviewed a challenge on direct appeal to the application of the Louisiana rule of evidence and the contention that exclusion of the evidence violated Chambers and the right to present a defense. The court observed that in Williamson v. U.S., 114 S.Ct. 2431 (1994) an issue was presented regarding the application of F.R.E. 804(b)(3). Williamson reversed a ruling that admitted a co-defendant's entire confession, which included statements in which he implicated himself and the defendant. The Court reasoned that the rule does not allow admission of non-self-inculpatory statements, even if they are made within a broader narrative that is generally self-inculpatory. The rule assumes that people tend not to make self-inculpatory statements unless they believe them to be true, but the fact that a person makes a broadly self-inculpatory confession does not make more credible the confession's non-self-inculpatory parts.

The Louisiana Supreme Court stated that straightforward application of the Louisiana rule of evidence would admit only those portions of Brandy's statements in which she specifically inculpated herself, but only if there were corroborating circumstances clearly indicating the trustworthiness of those statements. The court found no error in the trial court's findings regarding lack of trustworthiness and the exclusion of

the statements.  In response to the defense argument that the prosecution used some of the statements against Brandy at her trial, the court stated that did not mean they possessed independent worth as evidence of her co-perpetrator's identity, which is the issue in this case.  The Court specifically found that the exclusion "did not violate defendant's right to present a defense" under the Sixth Amendment as interpreted in Chambers.  State v. Coleman, 188 So.3d at 196.  The court reviewed Chambers and Holmes, as well as several related decisions.  It concluded: "We do not find these statements so critical that the trial court should have allowed them, and defendant has failed to show he was denied his fundamental right to present a defense in their absence."  State v. Coleman, 188 So.3d at 197.  The court also noted that, had any of Brandy's statements been admitted, the prosecution would have been permitted to present the statements in which she explicitly inculpated Petitioner.  "Thus, it is unlikely the inclusion of the selected statements would have reasonably affected the jury's assessment of Defendant's guilt."  Coleman, 188 So.3d at 198.

### D. Habeas Analysis

Much of the state court's decision was based on its rules of evidence.  Habeas corpus is not available to challenge the state courts' application of state-law evidentiary rules.  Lucio v. Lumpkin, 987 F.3d 451, 472 (5th Cir.), cert. denied, 142 S.Ct. 404 (2021).  "In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 112 S.Ct. 475, 480 (1991).  Accordingly, review is limited to whether the state court's decision ran afoul of constitutional law.  The state court adjudicated the claim on the merits, so

habeas relief is not permitted unless that adjudication (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d).

Petitioner first argues that the state court's decision was based on an unreasonable determination of the facts in violation of Section 2254(d)(2). State court factual findings are presumed to be correct, subject to being overcome only on a showing of clear and convincing evidence. Section 2254(e)(1). The Supreme Court has not defined the precise relationship between § 2254(d)(2) and § 2254(e)(1), Brumfield v. Cain, 135 S. Ct. 2269, 2282 (2015), but we do know that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance. Burt v. Titlow, 134 S.Ct. 10, 15 (2013). "The presumption of correctness not only applies to explicit findings of fact, but it also applies to those unarticulated findings which are necessary to the state court's conclusions of mixed law and fact." Young v. Dretke, 356 F.3d 616, 629 (5th Cir. 2004). The above review of the decision shows that it was within the bounds of reasonableness and based on the state court's careful assessment of the record. There is nothing in the state court's findings of the facts related to this claim that permits habeas relief.

Petitioner also argues that the state court decision ran afoul of Section 2254(d)(1) because it was an unreasonable application of federal law as determined by the Supreme Court. The only Supreme Court decisions Petitioner cites in this respect are Chambers and

Holmes.   The Louisiana Supreme Court reviewed both decisions in detail and conscientiously applied the facts of this case to the principles in those decisions.   Habeas relief is not permitted on this argument unless the state court "erred so transparently that no fairminded jurist could agree with that court's decision."   Bobby v. Dixon, 132 S.Ct. 26, 27 (2011) (per curiam).   And "a federal habeas court is authorized by Section 2254(d) to review only a state court's 'decision,' and not the written opinion explaining that decision." Pondexter v. Dretke, 346 F.3d 142, 148 (5th Cir. 2003), quoting Neal v. Puckett, 286 F.3d 230, 246 (5th Cir. 2002) (en banc).

As evidenced by the above discussion and the applicable precedents, reasonable minds might differ with respect to the state court's decision, but fairminded jurists could certainly agree with it as well.   Also, the Fifth Circuit in Lucio said that "the Supreme Court has instructed us that Chambers—like its other complete-defense cases—involved an idiosyncratic state rule of evidence that was 'arbitrary,' 'did not rationally serve any discernible purpose,' and 'could not be rationally defended.'" Lucio, 987 F.3d at 473-74. "The Supreme Court has never applied its complete-defense cases to discretionary evidentiary decisions under rules that are themselves constitutional," and the lower courts are not free on habeas to extend those decisions to other areas or apply them at a high level of generality. Id. at 474.   Thus, habeas relief is not permitted on this claim.

**Ineffective Assistance of Counsel**

### A. Introduction

Petitioner argues that his attorneys rendered ineffective assistance of counsel in various ways.   To prevail, Petitioner must establish both that (1) his counsel's performance

fell below an objective standard of reasonableness and (2) had counsel performed reasonably, there is a reasonable probability that the result in his case would have been different. Strickland v. Washington, 104 S.Ct. 2052, 2064 (1984). "Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim." Id. at 2071.

### B. Habeas Burden

Petitioner's Strickland claims were adjudicated and denied on the merits by the state court, so 28 U.S.C. § 2254(d) directs that the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether the determination was unreasonable, which is a substantially higher threshold. Schriro v. Landrigan, 127 S.Ct. 1933, 1939 (2007). The Strickland standard is a general standard, so a state court has even more latitude to reasonably determine that a defendant has not satisfied it. The federal court's review is thus "doubly deferential." Knowles v. Mirzayance, 129 S.Ct. 1411, 1420 (2009). For the federal court to grant relief, "[t]he state court decision must be so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." Woods v. Etherton, 136 S.Ct. 1149, 1151 (2016) (per curiam) (cleaned up).

### C. No Shoe Size Expert

The State presented evidence that the boots taken from Petitioner were a size nine and were spattered with blood from Mr. Brandon. Petitioner called his younger brother to testify that he had never seen Petitioner wearing the size nine boots in which he was arrested and that he believed Petitioner to wear a 10.5 or 11 shoe. The defense asked to

measure Petitioner's shoe size using a Brannock device in front of the jury. The trial court sustained an objection on the grounds that the defense did not have anyone with experience using the device, which the trial judge, calling on experience measuring feet while working in sporting goods stores, said was subject to manipulation. Defense counsel made a proffer-representation that Petitioner had been measured with the device and, "We would expect that to show a size between 10.5 and 11." Tr. Vol. 49, pp. 11004-11. Petitioner challenged this evidence ruling on appeal, and the Supreme Court of Louisiana held that the trial judge did not abuse his discretion by ruling that the defense needed someone with experience using the device to ensure that the demonstration would be useful to the jury. State v. Coleman, 188 So.3d at 198-99.

Petitioner argued in his post-conviction application that trial counsel was ineffective for failing to retain a shoe size expert so that the demonstration could have been performed. The trial court set forth the applicable Strickland standard and reasoned:

> Petitioner's argument fails to demonstrate that there would have been a different outcome had a shoe size expert been presented. Petitioner makes the argument that the shoe size expert would have supported the claim that the shoes were not Petitioner's size. However, the State's objection argues that Petitioner does not consider that the shoe size does not negate that Petitioner still could have been wearing the shoes and/or had access to the shoes. The Court agrees. If a shoe size expert had been presented, it may have had some conceivable effect, however, under Strickland, this is not sufficient.
>
> For these reasons, Petitioner's Claim #3 is DENIED.

Tr. Vol. 55, p. 12505. The appellate court denied a writ application on the showing made. The Supreme Court of Louisiana denied a writ application and stated that Petitioner "fails

to show that he received ineffective assistance of counsel under the standards of Strickland[.]"

"[U]nsupported claims regarding [an] uncalled expert witness are speculative and disfavored by [the Fifth Circuit] as grounds for demonstrating ineffective assistance of counsel." Evans v. Cockrell, 285 F.3d 370, 377 (5th Cir. 2002). Petitioner must be able to show a reasonable probability that, but for counsel not hiring such an expert, the jury would have had a reasonable doubt concerning Petitioner's guilt. Id; Allen v. Stephens, 619 Fed. Appx. 280, 287 (5th Cir. 2015) (no prejudice shown where there was no evidence expert would have testified favorable to the defense).

The State points out that Petitioner, when asked to come to the police station, put on the boots in question, which were beside him, without mentioning that they did not fit or belonged to someone else. He told an officer that the boots were the only shoes he owned. It was not until an investigator asked him about blood on the boots that he claimed they belonged to Brandy's brother.

Counsel attempted to present evidence of shoe size but ran into an evidentiary objection that perhaps could have gone either way. A person presenting a Strickland claim must rebut "a strong presumption that counsel's conduct falls within the wide range of professional assistance." Strickland, 104 S.Ct. at 2065. That appointed counsel did not both anticipate the unfavorable evidentiary ruling and attempt to obtain funds to retain a shoe size expert does not equate to performance below the wide range of what is acceptable performance under the Sixth Amendment. Trial counsel is "entitled to formulate a strategy that was reasonable at the time and to balance limited resources in accord with effective

trial tactics and strategies." Evans v. Davis, 875 F.3d 210, 218 (5th Cir. 2017). As for prejudice, the evidence that Petitioner said he had no other shoes and wore the boots without complaint until aware they may be incriminating makes the shoe size evidence of significantly less benefit to the defense.

The state courts made a reasoned and reasonable assessment of this Strickland claim. It cannot be said that the decision was so lacking in justification that there was an error beyond any possibility for fair-minded disagreement. Habeas relief is, therefore, not available under the doubly deferential standard of review.

### D. No objection to Dawn Finley's Testimony on Coma Scale

Paramedic Tommy Adams testified at the first trial that he was able to communicate with Mrs. Brandon and that she indicated the assailants were two white people. Adams died before the second trial, so the jurors at that trial reviewed his earlier testimony. Adams had testified that he assessed Mrs. Brandon's condition using the Glasgow Coma Scale and that she rated 14 of 15.

The State attempted to show that Mrs. Brandon was not as responsive as Adams indicated. Dawn Finley, Mrs. Brandon's daughter, testified that she was familiar with the Glasgow Coma Scale and, when she worked in ICU as a nurse, she would use the scale for a patient with a head injury. She admitted that she had dealt with the issue "infrequently" during her career. Some emergency room patients required such assessment, but another nurse would perform the test and then give her a report, which she knew how to read and interpret. Ms. Finley described the coma scale. She said that someone from 9 to 12 would be moderately affected, and from 12 to 15 would be someone who is normal. She testified

that a 14 for her mother would have been "a little high."  Ms. Finley said that, in the years after the attack, she asked her mother about it but received no oral or written response.  On cross-examination, defense counsel and Ms. Finley clarified that she never received any "consistent reliable information" from her mother.  Tr. Vol. 54, pp. 10820-24.

Petitioner argued in his post-conviction application that trial counsel was ineffective for not objecting to this testimony on the grounds that Ms. Finley was not an expert and the coma scale was outside her area of specialized knowledge.  The trial court denied the claim, stating:

> The witness did not claim to be an expert and her testimony reveals that she made it clear that she does not frequently utilize the test in question. Although, this may result in a conceivable different outcome, it does not rise to the level of a reasonable probability of a different outcome.

> For these reasons, Petitioner's Claim #4 is DENIED.

Tr. Vol. 55, p. 12506.   The appellate and supreme courts summarily denied writ applications.

Ms. Finley's testimony about the coma scale rating was not particularly important. What was important was what Ms. Finley saw and heard from her mother after the attack. She testified on those issues based on her firsthand observations.  Any objection by counsel to her testimony about the coma scale, even if sustained, would not give rise to any reasonable likelihood of a different verdict.  The state court's denial of this Strickland claim withstands review under the doubly deferential habeas standard.

### E. Mark Rogers' Qualification as Bloodstain Pattern Expert

Mark Rogers, a retired crime scene investigator with decades of experience, testified for the prosecution. He was tendered as an expert in the area of crime scene reconstruction, including bloodstain pattern analysis. Rogers testified about various blood evidence at the scene. He opined that the blood on the boots was caused by a high-velocity impact, such as a bullet, with the impact taking place within 36 inches of the boots.

Petitioner argued in his post-conviction application that trial counsel was ineffective because he should have objected that Rogers was not certified in bloodstain pattern analysis. Rogers testified that he had extensive training in subject matter such as crime scene reconstruction, fingerprint identification, shooting incident reconstruction, and bloodstain pattern analysis. That study led to his certification by an accrediting agency as a senior crime scene analyst. He explained that the field of crime scene analysis uses a variety of disciplines, including bloodstain pattern analysis. An applicant for certification as a senior crime scene analyst must take a bloodstain pattern analysis course before being tested. On cross-examination, defense counsel asked Rogers if he was certified in bloodstain pattern analysis. Rogers said that he was not; his most recent testing on it was in March of the prior year as part of his recertification test required every five years for a senior crime scene analyst. He also took a four-hour bloodstain pattern analysis workshop in June of the prior year. He explained that expertise in bloodstain pattern analysis is a subset of his certification, but he did not have a specific certification in that area. Tr. Vol. 48, pp. 10876-10924.

Petitioner presented this claim in his post-conviction application.  The trial court wrote that Petitioner was attacking counsel's strategy rather than professional performance, as counsel did cross-examine the witness on his qualifications.  "Furthermore, although a different outcome may be conceivable, it is not reasonably probable that a different outcome would have occurred but for objecting to this specific witness's qualifications." Tr. Vol. 55, pp. 12506-07.

The record demonstrates that Mr. Rogers may have lacked a specific certification in blood pattern analysis, but the broader field in which he was certified required education and testing of his proficiency in that area.  Defense counsel pointed out the lack of a more specific certification.  There is little reason to believe that, had he objected to the qualification of Rogers as an expert in the field of bloodstain patterns, the objection would have been sustained or that the verdict would have differed.  The voir dire of Rogers demonstrated plainly that he had adequate education, training, and experience in the area to be accepted as an expert/opinion witness in the bloodstain field.  The state court's denial of this Strickland claim was not an objectively unreasonable application of Strickland, so habeas relief is not permitted.

**F. Cross-Examination of Bobby Evans**

Bobby Evans, when called at the second trial, was reluctant to again testify against Petitioner.  He said he did not want to "follow up with this" and felt like the prosecution was "pushing me to this here."  He said, "I told you I ain't want to be no witness when y'all came down there and seen me and gave me the envelope I told y'all I don't want to be no witness" because he needed to focus on himself and his own charges.  After some additional

questions to get Evans to testify, he said, "I don't want to have no dealings with it when y'all come down there pushing me, talking about putting money on my books, I don't want to have no dealings with that, man." Doc. 1-4, pp. 387-88.

Petitioner argued in his post-conviction application that defense counsel was deficient because he did not cross-examine Evans about a potential financial reward in exchange for his testimony. The issue was later explored at a post-trial hearing on a motion for new trial. DA Investigator Don Ashley testified that he visited Evans at the jail to prepare him for his anticipated trial testimony. Ashley was asked about the reference to "money on his books." Ashley testified that, near the end of their conversation, Evans made comments about not having soap or toiletries because he was serving his sentence in another parish and had been transferred to Caddo Parish without any personal property. Ashley said that he "offered to put some money on his book so he could get the toiletries that he was needing." But Evans declined because he owed the jail money from a past stay. Accordingly, Ashley did not give Evans any money. He also denied promising Evans any type of consideration to get him to be a witness. Ashley said that Evans had been very cooperative during the jail visit and had given no indication of his uncooperative appearance at trial.

The trial court's post-conviction ruling globally denied this and all other claims that counsel failed to adequately cross examine or impeach various state witnesses. The court reviewed the Strickland rules and held that Petitioner failed to demonstrate that any errors by counsel were so serious that they violated his right to effective assistance of counsel, and there was no reasonable probability that the outcome would have been different but for

the alleged shortcomings of counsel.  The arguments were characterized as challenges to counsel's strategy about how to handle the cross-examination of witnesses, which is generally not a valid basis for a Strickland claim.  Tr. Vol. 55, pp. 12502-03.

The jury heard Evans testify that the prosecution was allegedly "talking about putting money on my books," so it was free to consider that when assessing Evans' credibility.  Counsel may have been able to score some points against the prosecution by asking follow-up questions on the topic, but the lack of such questions does not undermine confidence in the outcome of the trial.  The witness was obviously reluctant and even hostile to the prosecution, so suggesting that he was motivated by an offer of compensation would not have had a significant impact on the credibility assessment.  Under these circumstances, the state court's denial of this claim was not an objectively unreasonable application of Strickland.

### G. Cross-Examination of Tammy Holmes

Petitioner argued in his post-conviction application that counsel did not adequately cross-examine Tammy Holmes about differences in her testimony at the two trials regarding the identification of Petitioner in the ATM photograph.  At the first trial, Ms. Holmes was shown a photograph, Exhibit 8, with two people in it.  She said that one of them was Brandy Holmes.  When asked about the second person, she said, "It looks like Robert Coleman."  When asked why, she said, "His hair, the way he's built."  Defense counsel asked on cross-examination if she could make an identification from the picture. She said it "looks like them to me" but she did not "guess" that she could make an identification.  On redirect, it was clarified that the second person's face was not in the

picture. Ms. Holmes said that she was comfortable telling the jury that it was Petitioner based on the way he was built and his hair. Tr. Vol. 21, pp. 4350-53.

At the second trial, Tammy Holmes was shown the same Exhibit 8 and asked if she recognized the persons in the photo. She answered, "Brandy Holmes and Robert Coleman." Tr. Vol. 45, p. 10329. On cross, defense counsel asked Ms. Holmes if she had been asked to identify the persons in the photo in a prior proceeding. He asked her if, in her prior testimony, she said of the second person, "Well, it looks like Robert Coleman." She answered, "Probably so." Tr. Vol. 45, pp. 10343-44.

The state court denied this Strickland claim along with the other post-conviction claims regarding inadequate cross-examination of witnesses. The record shows that counsel did bring to the jury's attention that Ms. Holmes had been less positive in prior testimony about who was in the photo with Brandy. Petitioner's claim that counsel fell short in this regard, and that the verdict likely would have been different with more focus on this issue, is not supported by the record. The state court's adjudication of this claim was a reasonable application of Strickland and bars habeas relief.

### H. Lt. McDonnell's Testimony about Footprint Impressions

Lt. Owen McDonell testified that he took scans of the soles of the shoes worn by Brandy Holmes and Petitioner, as well as others who were about the crime scene. He compared them to a bloody footprint believed to be left by a perpetrator. McDonell testified that he could exclude Brandy Holmes' shoes as making the print, but he could not exclude Petitioner's shoes. The footprint at the crime scene and Petitioner's boot had the same tread design and same size. Tr. Vol. 46, pp. 10461-65. On cross-examination he

conceded that he could not say with 100% accuracy the size of the shoe that left the print, but he could tell from comparison that the bloody print and Petitioner's boot were "close to the same size." He could not determine the exact brand of the shoe that made the print. Id. at 10500-04.

Petitioner argues that counsel should have used a report from Lt. Bass to impeach McDonell. Petitioner states that the Bass report said that the shoe impression recovered at the scene possessed a pattern similar to both Petitioner and Holmes' shoes. This impeachment, Petitioner urges, could have been used to show that Petitioner may not have been present at the home.

It appears that neither party cited to the record location of the Bass report among the scores of volumes. The State represents that Bass wrote that upon initial observation of *photographs*—not the actual footwear—there looked to be similarities in the shoe patterns, so he requested a comparison be made with the actual shoes. Petitioner does not contest this representation. McDonell described how he made a comparison with images of the soles of the shoes, which allowed him to reach a more definite conclusion than Bass's initial observation of photographs alone. It appears that any attempt to use the Bass report to cross-examine McDonell would have been met with a simple explanation. The state court denied this post-conviction application claim, and its decision was not an objectively unreasonable application of Strickland.

## I. Failure to Cross-Examine Law Enforcement

Petitioner's next Strickland claim asserts that counsel should have cross-examined law enforcement witnesses about what he characterizes as holes in the case or ignored leads

in the investigation.  The areas listed by Petitioner are (1) investigators did not collect a bloody handprint pictured on upholstery of a dining room chair, (2) investigators did not collect VHS tapes found in the living room or swab them for DNA, (3) investigators collected but did not test any of the items from the burn pile at the Bruce residence, and (4) investigators swabbed the rear handle of the Brandon's kitchen door but did not test it for DNA.  The State responds that the dining room chair was covered with fabric that presented zero possibility of an identifiable print, and the VCR tapes were not tested because they were of no apparent probative value in the opinion of crime scene technicians.  Petitioner did not suggest what form of "testing" should have been done on the burn pile items, and defense counsel could have arranged for DNA testing of the door handle swab if they thought it was helpful to the defense.

The state court denied these Strickland claims on the merits.  Counsel is not required to ask every conceivable question and attempt to poke every possible hole in the prosecution's case.  There has been no showing that, had counsel pursued these lines of questioning, it would have led to anything helpful to the defense or, more important, a reasonable likelihood of a different verdict.  No relief is permitted on this claim.

### J. Cumulative Prejudice

Petitioner's final Strickland claim asserts that all of the alleged errors of counsel, considered together, rendered the trial unfair.  The state court considered this claim in its post-conviction application ruling and found that Petitioner did not meet his burden under Strickland.  "Looking at the cumulative claims, although it is conceivable that a different outcome is possible, it does not rise to the level of reasonable probability."  Tr. Vol. 55, p.

12507.  The state court's rejection of this claim based on a lack of showing of <u>Strickland</u> prejudice was reasonable and prohibits habeas relief.

**Denial of Right to Testify**

Petitioner, having experienced one complete first-degree murder trial in 2005, sat through the guilt phase of his 2005 trial without expressing any desire to testify.  The case proceeded to the penalty phase.  Both sides rested after presenting evidence.  The trial court asked if either the State or defense had anything to put on the record before closing arguments began, and both sides said they did not.  Closing arguments for the penalty phase were then presented.  As Judge Michael Pitman was about to instruct the jury, Petitioner for the first time raised the issue of his testimony:

> Defendant: Excuse me, Your Honor.  I have question I want to ask you please, sir.

> Court: Excuse me.

> Defendant: Your Honor, I would like to address the Court myself.  Is there any kind of way that I can take the stand at this point right here?

> Court: No sir. The trial has concluded.

> Defendant: *I want to take the stand in my penalty phase*, Your Honor.  Do I have a right to speak before my sentence is cast upon me? (Emphasis added.)

> Court: You had a right to speak, sir, but the penalty phase is concluded.

> Defendant: But according to my attorneys I was waiting and trying to address the Court before the State took the stand and I wanted to address the Court.  My attorney denied me the right myself to address the jury before the State took the stand, Your Honor.

| Court: | Sir, we have been here, you have been present during all of these proceedings. You knew that the penalty phase is concluded. In fact, at the close of the last night I asked if there was any motions for either side, and I informed each side that that was the final time to propose any motions. The State said they had none, the defense said they had none. I made it very clear that closing arguments would take place at 9:00 o'clock this morning. We were here, I asked if there was anything to be put on the record before the jury came in. The State had nothing, the defense had nothing. The closing arguments have been made and I am going to instruct the jury. This case is concluded, sir. And if you wanted to take the stand you certainly had the right to do that. You've been here before, you know how this process works. You have five attorneys representing you, and there is no question in my mind that you knew that you had the right to do that. |
|---|---|
| Defendant: | No, sir. |
| Court: | And you did not do that. And the case is now concluded, and I will instruct the jury when we come back at five minutes until. |

Tr. Vol. 52, pp. 11656-61. Petitioner argued on direct appeal and in his habeas petition that his right to testify was denied. A defendant has a fundamental constitutional right to testify. Rock v. Arkansas, 107 S.Ct. 2704 (1987). When the defendant contends that trial counsel interfered with his right to testify, the "appropriate vehicle for such claims is a claim of ineffective assistance of counsel." Sayre v. Anderson, 238 F.3d 631, 634 (5th Cir. 2001). A violation of this right occurs only if the final decision that the defendant would not testify was made against his will. Emery v. Johnson, 139 F.3d 191, 198 (5th Cir. 1998).

The Supreme Court of Louisiana addressed this issue at length on direct appeal. It cited and discussed Rock, as well as Louisiana law decisions regarding the right to testify and procedures associated with the same. It noted that Louisiana law imposes a common-sense limitation of testimony to the evidence-taking stage of trial. There was no indication

that Petitioner expressed a desire to testify until after the close of the evidence and even after closing arguments in the penalty phase by both sides.  Under those circumstances, the court found that the request to testify was untimely, and there was no error in the trial court's refusal to reopen the trial and allow him to testify at that point.  State v. Coleman, 188 So.3d at 219-22.

Habeas relief is available only if the state court's decision on the merits was an objectively unreasonable application of clearly established federal law as decided by the Supreme Court.  There is nothing in Rock or any other Supreme Court decision cited by Petitioner that requires a trial court to reopen the evidence after closing arguments at the conclusion of the penalty phase.  There was no evidence to suggest that counsel in any way affirmatively prevented Petitioner from testifying despite his wish to do so.  There was nothing unreasonable about the state court's decision in these circumstances.  And, notably, Petitioner did not ask to testify on guilt.  He said, "I want to take the stand in my *penalty phase*, Your Honor."  The penalty issue is no longer at issue, given the agreed life sentence. By the time Petitioner raised the issue, the guilt stage of his trial—the only thing at issue here—was completed with a verdict returned.

Even if one were to take some issue with the state court's decision, Section 2254(d) "stops short of imposing a complete bar on federal court relitigation of claims already rejected in state proceedings" and reaches only "extreme malfunctions" in the state criminal justice system.  Harrington v. Richter, 131 S.Ct. 770, 786 (2011).  Thus, "even a strong case for relief does not mean the state court's contrary conclusion was

unreasonable." Id. Petitioner's arguments certainly do no warrant habeas relief under this standard.

**Cumulative Error**

Petitioner argues that each of the individual errors alleged in his petition warrant reversal on their own terms, but the court must also look to the cumulative effect of said errors in assessing the fairness and reliability of the conviction. This claim was presented in his post-conviction application. The state court addressed two similar "cumulative effect" claims and found that they both lacked merit. Tr. Vol. 55, p. 12507. The state appellate and supreme courts summarily denied writ applications as discussed above.

Cumulative error on federal habeas review is a narrow and rare form of due process violation. Derden v. McNeel, 978 F.2d 1453, 1461 (5th Cir. 1992) (en banc). The petitioner must show, among other things, that individual errors of constitutional dimension (rather than mere violations of state law) so infected the entire trial that the resulting conviction violates due process. Allen v. Vannoy, 659 Fed. Appx. 792, 818 (5th Cir. 2016). Petitioner's mere repetition of his prior claims, each of which has been rejected on the merits, does not make out a rare case for relief. Petitioner was afforded a jury trial where he was represented by multiple experienced attorneys. They and the conscientious trial judge devoted ample attention to and consideration of every important issue that arose. Habeas relief is not permitted on this final claim.

Accordingly,

It is recommended that Petitioner's petition for writ of habeas corpus be denied.

**Objections**

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), parties aggrieved by this recommendation have fourteen (14) days from service of this report and recommendation to file specific, written objections with the Clerk of Court, unless an extension of time is granted under Fed. R. Civ. P. 6(b).  A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof.  Counsel are directed to furnish a courtesy copy of any objections or responses to the District Judge at the time of filing.

A party's failure to file written objections to the proposed findings, conclusions and recommendation set forth above, within 14 days after being served with a copy, shall bar that party, except upon grounds of plain error, from attacking on appeal the unobjected-to proposed factual findings and legal conclusions accepted by the district court.  See Douglass v. U.S.A.A., 79 F.3d 1415 (5th Cir. 1996) (en banc).

An appeal may not be taken to the court of appeals from a final order in a proceeding under 28 U.S.C. § 2254 unless a circuit justice, circuit judge, or district judge issues a certificate of appealability. 28 U.S.C. § 2253(c); F.R.A.P. 22(b).  Rule 11 of the Rules Governing Section 2254 Proceedings for the U.S. District Courts requires the district court to issue or deny a certificate of appealability when it enters a final order adverse to the applicant. A certificate may issue only if the applicant has made a substantial showing of

the denial of a constitutional right. Section 2253(c)(2). A party may, within fourteen (14) days from the date of this Report and Recommendation, file a memorandum that sets forth arguments on whether a certificate of appealability should issue.

THUS DONE AND SIGNED in Shreveport, Louisiana, this 21st day of February, 2023.

Mark L. Hornsby
U.S. Magistrate Judge